UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

X-RAY OPTICAL SYSTEMS, INC. ,

     Plaintiff,

v.

INNOV-X SYSTEMS, INC.,

     Defendant.

Civil Action No. 1:11-CV-0156 (TJM/RFT)

DEMAND FOR JURY TRIAL

**INNOV-X'S ANSWER,
AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

Defendant Innov-X Systems, Inc. ("Innov-X") hereby answers the Complaint filed by X-Ray Optical Systems, Inc. ("XOS") on February 9, 2011.  Innov-X, by answering the Complaint, does not waive and expressly reserves all rights to seek relief by appropriate motions, including its concurrently filed motion to dismiss.  Innov-X denies each and every allegation in the Complaint that is not specifically admitted herein.  Innov-X answers the individually numbered paragraphs of the Complaint as follows:

<u>**"THE PARTIES"**</u>

1.     Admitted, on information and belief.

2.     Admitted.

3.     This allegation is a legal conclusion to which no response is required.

4.     Innov-X admits that it is doing business in New York and in this judicial district. Innov-X further admits that the contracts that are the subject of some of XOS's allegations state the language set-off by quotation marks and quoted in this paragraph.  Innov-X admits that some of the events giving rise to the claims in the Complaint occurred in New York and in this judicial

district.  The remaining allegations in paragraph 4 are legal conclusions to which no response is

required. To the extent a response is required, Innov-X denies the remaining allegations in

paragraph 4.

"<u>**FACTUAL BACKGROUND**</u>"

5.      Innov-X admits, on information and belief, that XOS develops and

commercializes x-ray optics, and that x-ray optics guide and/or filter x-rays and can be used in x-

ray analysis instruments to improve their performance.  Innov-X is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of paragraph 5,

and therefore denies them.

6.      Innov-X is without knowledge or information sufficient to form a belief as the

truth of the allegations in paragraph 6 and, on this basis, denies the allegations.

7.      Innov-X admits that it was established in 2001 for the purpose of developing and

commercializing XRF systems.  Innov-X admits that in 2004 it was a company comprising

approximately 20 employees located in Woburn, Massachusetts.  Innov-X denies the remaining

allegations in paragraph 7.

8.      Innov-X admits that in 2004, Innov-X and XOS commenced certain discussions.

Innov-X denies the remaining allegations in paragraph 8.

9.      Innov-X admits that Innov-X and XOS entered into a Mutual Non-Disclosure

Agreement dated March 30, 2004 ("NDA#1").  The remaining allegations in paragraph 9 are

legal conclusions to which no response is required, or are attempts to characterize the contents of

a document, which speak for themselves.

10.     Innov-X admits that NDA#1 was executed by Bradley Hubbard-Nelson, Innov-

X's Vice President of Research and Development.  The remaining allegations in paragraph 10

are legal conclusions to which no response is required, or are attempts to characterize the contents of a document, which speak for themselves.

11.     Innov-X admits that in 2005, communications occurred between XOS and Innov-X, including information in emails and documents, and information in conversations between Innov-X and XOS personnel at their respective places of business.  Innov-X denies the remaining allegations in paragraph 11.

12.     Innov-X admits that in late 2005 the parties discussed a project whereby XOS would build a monochromator optical component for use with an XRF product that Innov-X had independently and already conceived.  Innov-X also admits that monochromating x-ray optics have certain performance benefits over other types of x-ray optics, and in certain circumstances can have polarizing effects.  Innov-X denies the remaining allegations in paragraph 12.

13.     Innov-X admits that XOS's communications to Innov-X were directed to XOS's provision of a monochromator optical component according to the specifications that Innov-X had requested for use with an XRF product that Innov-X had independently and already conceived.  Innov-X denies the remaining allegations in paragraph 13.

14.     Innov-X is without information sufficient to form a belief as to the truth of the allegations in paragraph 14, and on this basis, denies the allegations in paragraph 14.

15.     Innov-X admits that Innov-X and XOS entered into an agreement dated February 9, 2006, a copy of which is attached as Exhibit B to the complaint ("NDA#2").  The remaining allegations in paragraph 15 are legal conclusions to which no response is required, or are attempts to characterize the contents of a document, which speak for themselves.

16.     Innov-X admits that Bradley Hubbard-Nelson, Innov-X's Vice President of Research and Development, signed NDA#2.  The remaining allegations in paragraph 16 are legal

conclusions to which no response is required, or are attempts to characterize the contents of a document, which speak for themselves.

17.     Innov-X admits that communications between XOS and Innov-X took place in 2006.  Innov-X denies the remaining allegations of paragraph 17.

18.     Innov-X admits that, in or around late 2006 through in or around early 2007, it substantially stopped communications with XOS due to XOS's continued misrepresentations and delay.  Innov-X is without knowledge or information sufficient to form a belief as the truth of the remaining allegations in paragraph 18 and, on this basis, denies the remaining allegations in the paragraph 18.

19.     Innov-X admits the allegations in paragraph 19, to the extent that "late 2006" means October 2006 or earlier.  Innov-X otherwise denies the allegations in this paragraph.

20.     Innov-X is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 and therefore denies them.

21.     Innov-X is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 and therefore denies them.

22.     Innov-X is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 and therefore denies them.

23.     Denied.

24.     Denied.

25.     Denied.

26.     Denied.

## **"DEFENDANT'S WRONGFUL CONDUCT"**

27.     Innov-X admits that on October 24, 2006, it filed a U.S. patent application titled "Fuel Analysis System" with the U.S. Patent and Trademark Office, listing as inventors Peter John Hardman and Bradley Hubbard-Nelson.  Innov-X admits that this application issued on October 23, 2007 as U.S. Patent Number 7,286,633 (the "'633 patent"), a copy of which is attached as Exhibit C to the complaint.  Innov-X admits that no current XOS employee was listed as an inventor of the '633 patent.  Innov-X is without information sufficient to form a belief as to the truth of the allegation that XOS was unaware of the filing of the '633 patent application, and therefore denies the allegation.  Innov-X denies the remaining allegations in paragraph 27.

28.     Innov-X admits that on December 27, 2006, it filed a U.S. patent application titled "Dual Source XRF System" with the U.S. Patent and Trademark Office, listing as inventors Peter John Hardman and Bradley Hubbard-Nelson.  Innov-X admits that this application issued on October 21, 2008 as U.S. Patent Number 7,440,541 (the "'541 patent"), a copy of which is attached as Exhibit D to the complaint.  Innov-X admits that no current XOS employee was listed as an inventor of the '541 patent.  Innov-X is without information sufficient to form a belief as to the truth of the allegation that XOS was unaware of the filing of the '541 patent application, and therefore denies the allegation.  Innov-X denies the remaining allegations in paragraph 28.

29.     Innov-X admits that it was credited in a press release with making the statement: "Innov-X has deployed this state-of-the-art optics technology for marine fuel measurements with the world's largest marine shipping company A.P. Moller-Maersk.  By working with HORIBA, we have adapted it to critical measurements of C1, S and other elements in petrochemical and power-related hydrocarbons.  Moreover, HORIBA has exceptionally strong distribution channels

into all of these targeted markets plus tremendous market knowledge."  Innov-X denies the remaining allegations in paragraph 29.

30.     Denied.

31.     Innov-X admits that at least one of its press releases included the statement, ". . . patented diffractive optics technology originally developed by Innov-X for marine fuels analysis . . ."  Innov-X denies the remaining allegations in paragraph 31.

32.     Denied.

## **"FIRST CLAIM"**

33.     In response to this paragraph, Innov-X incorporates by reference herein its responses to paragraphs 1 – 32, as set forth above.

34.     Denied.

35.     Innov-X is without knowledge or information sufficient to form a belief as to the truth of whether "Zewu Chen, Ning Gao, and James Quinn were employees of XOS and duly obligated to assign their rights to [any inventions] to XOS," and on this basis, denies this allegation.  Innov-X denies the remaining allegations in paragraph 35.

36.     Denied.

37.     Innov-X admits that Zewu Chen, Ning Gao, and James Quinn were not named as inventors of the '633 and '541 patent.  Innov-X is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on this basis denies the remaining allegations.

38.     Denied.

39.     Denied.

## "SECOND CLAIM"

40.     In response to this paragraph, Innov-X incorporates by reference herein its responses to paragraphs 1 – 39, as set forth above.

41.     The allegations in paragraph 41 are legal conclusions to which no response is required.

42.     The allegations in paragraph 42 are legal conclusions to which no response is required.

43.     Denied.

44.     Denied.

45.     Denied.

## "THIRD CLAIM"

46.     Because the allegations in Paragraph 46 are the subject of a pending motion to dismiss, no response is required.

47.     Because the allegations in Paragraph 47 are the subject of a pending motion to dismiss, no response is required.

48.     Because the allegations in Paragraph 48 are the subject of a pending motion to dismiss, no response is required.

49.     Because the allegations in Paragraph 49 are the subject of a pending motion to dismiss, no response is required.

50.     Because the allegations in Paragraph 50 are the subject of a pending motion to dismiss, no response is required.

## "FOURTH CLAIM"

51.     Because the allegations in Paragraph 51 are the subject of a pending motion to dismiss, no response is required.

52.     Because the allegations in Paragraph 52 are the subject of a pending motion to dismiss, no response is required.

53.     Because the allegations in Paragraph 53 are the subject of a pending motion to dismiss, no response is required.

54.     Because the allegations in Paragraph 54 are the subject of a pending motion to dismiss, no response is required.

55.     Because the allegations in Paragraph 55 are the subject of a pending motion to dismiss, no response is required.

56.     Because the allegations in Paragraph 56 are the subject of a pending motion to dismiss, no response is required.

## "FIFTH CLAIM"

57.     Because the allegations in Paragraph 57 are the subject of a pending motion to dismiss, no response is required.

58.     Because the allegations in Paragraph 58 are the subject of a pending motion to dismiss, no response is required.

59.     Because the allegations in Paragraph 59 are the subject of a pending motion to dismiss, no response is required.

60.     Because the allegations in Paragraph 60 are the subject of a pending motion to dismiss, no response is required.

61.     Because the allegations in Paragraph 61 are the subject of a pending motion to dismiss, no response is required.

## "SIXTH CLAIM"

62.     Because the allegations in Paragraph 62 are the subject of a pending motion to dismiss, no response is required.

63.     Because the allegations in Paragraph 63 are the subject of a pending motion to dismiss, no response is required.

64.     Because the allegations in Paragraph 64 are the subject of a pending motion to dismiss, no response is required.

65.     Because the allegations in Paragraph 65 are the subject of a pending motion to dismiss, no response is required.

## "SEVENTH CLAIM"

66.     Because the allegations in Paragraph 66 are the subject of a pending motion to dismiss, no response is required.

67.     Because the allegations in Paragraph 67 are the subject of a pending motion to dismiss, no response is required.

68.     Because the allegations in Paragraph 68 are the subject of a pending motion to dismiss, no response is required.

69.     Because the allegations in Paragraph 69 are the subject of a pending motion to dismiss, no response is required.

## "XOS'S PRAYER FOR RELIEF"

Innov-X hereby incorporates by reference its responses to all paragraphs in XOS's Complaint as though fully set forth herein.  XOS is not entitled to any of the relief it requests in the Complaint.

## AFFIRMATIVE DEFENSES

Innov-X asserts the following affirmative defenses to the claims in the XOS's complaint and reserves the right to amend its Answer, Affirmative Defenses, and Counterclaims as additional information becomes available.  Innov-X hereby incorporates by reference into each of its affirmative defenses, the facts recited in its counterclaim (paragraphs 1 – 52, below).

1.      The complaint, in whole or in part, fails to state a claim against Innov-X upon which relief may be granted.

2.      XOS's claims are barred, in whole or in part, by the applicable statutes of limitations and/or statutes of repose.

3.      XOS's claims are barred, in whole or in part, by the doctrines of estoppel and waiver.

4.      XOS's claims are barred, in whole or in part, by the doctrine of laches.

5.      XOS's claims are impermissibly duplicative.

6.      XOS's claims are barred because the damages alleged are speculative.

7.      XOS's claims are barred by the doctrine of unclean hands.

8.      XOS's claims are barred, in whole or in part, because XOS has failed to do equity, and so is not entitled to equity.

9.      XOS's claims are barred, in whole or in part, by the failure to join one or more indispensible parties.

10.     XOS lacks standing to assert the claims in the complaint, in whole or in part.

11.     XOS's claims, including without limitation its claims for punitive damages, enhanced damages, and attorneys' fees and costs, are barred because Innov-X acted in good faith at all times.

12.     XOS is not entitled to injunctive relief because any injury to XOS is not immediate or irreparable, and XOS has an adequate remedy at law.

13.     Innov-X reserves the right to amend this Answer and Affirmative Defenses, and to rely upon affirmative defenses disclosed by further investigation and discovery.

## INNOV-X'S PRAYER FOR RELIEF

WHEREFORE, Innov-X prays for relief as follows:

1.      For an Order dismissing XOS's Complaint with prejudice and denying each and every request for relief made by XOS;

2.   For an Order awarding Innov-X its attorneys' fees, costs, and disbursements incurred in defending this action;

3.      For an Order declaring that, pursuant to 35 U.S.C. § 285, and/or other applicable laws, this is an exceptional case that merits awarding Innov-X its reasonable attorneys' fees;

4.      Grant any such other and further relief that the Court deems proper.

## INNOV-X'S COUNTERCLAIM:  FRAUD

Innov-X brings the following counterclaim for fraud against XOS, stemming from XOS's bad faith, misleading, and fraudulent practices.  Innov-X alleges as follows:

1.      Innov-X Systems, Inc. ("Innov-X") is a Delaware corporation with a principal place of business at 100 Sylvan Road, Suite 100, Woburn, Massachusetts, 01801.

2.      On information and belief, X-Ray Optical Systems, Inc. ("XOS") is a Delaware

corporation with a principal place of business at 15 Tech Valley Drive, East Greenbush, New York, 12061.

3.      XOS's action arises under the patent laws of the United States including 35 U.S.C. §256.  This Court has jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367. Venue is proper in this district because the original action was filed in this district by XOS.

4.      Innov-X designs, manufactures, and sells, *inter alia*, innovative x-ray fluorescence ("XRF") analysis systems that analyze the composition of sample compounds, and that detects the chemical elements present in such compounds.  XRF systems rely on the physical phenomenon of x-ray fluorescence.

5.      Among such innovative Innov-X systems are energy dispersive x-ray fluorescence ("EDXRF") systems that can measure multiple elements simultaneously.

6.      In 2005, Innov-X began development of a bench top EDXRF system suitable for deployment on ships and other seafaring vessels.  The development team included Innov-X's scientists Dr. Peter Hardman and Dr. Bradley Hubbard-Nelson.

7.      Prior to August 2005, as part of this development project, Innov-X's scientists formed and conceived an EDXRF system that would perform the challenging task of measuring aluminum (Al) and silicon (Si) in a compound, such as petrochemical fuel, with high sulfur content.  This task was particularly challenging because accurately measuring Al and Si (known in the industry as "catfines") in the presence of relatively high sulfur content was difficult to do with EDXRF systems.

8.      The system that Innov-X's scientists conceived (the "Catfine EDXRF System") included at least one x-ray source that emits x-rays at an energy level below but proximate the absorption edge of sulfur, a monochromator between the source and the fuel sample for directing

x-rays at a single energy level at the fuel sample, a detector responsive to x-rays emitted by the sample, and an analyzer.

9.      In particular, one embodiment of the system that Innov-X's scientists conceived prior to August 2005, included a Molybdenum ("Mo") x-ray source coupled with a monochromator.  This design was conceived in part to address the challenging problem of measuring low concentrations of Al and Si in the presence of relatively high sulfur concentrations.

10.     In or around August 2005, after the Catfine EDXRF System was fully conceived, Innov-X scientists proceeded to physically build the already conceived system.  To do so, they needed to purchase various components, and then assemble those components according to the design of the Catfine EDXRF System they had conceived.

11.     For example, in or around August 2005, Innov-X scientist Dr. Peter Hardman contacted Varian X-Ray, a known supplier of x-ray tube components, to provide an x-ray tube for use in the conceived Catfine EDXRF System.  Also in or around August 2005, Dr. Hardman contacted Ketek to provide Innov-X with detectors for use in the already conceived Catfine EDXRF System.

12.     In or around August 2005, as part of this process of seeking out component parts from vendors, Innov-X's Dr. Hardman contacted XOS by email, then a known vendor in the industry that provided optical components for XRF systems.  Dr. Hardman, in this email communication, inquired about the possibility of XOS providing a monochromator (an optical component) for use in the already conceived Catfine EDXRF System.

13.     On August 10, 2005, XOS responded by email to Dr. Hardman's request and inquired about the application in which the requested monochromator would be used.  XOS, in

this email, also provided a price estimate for the requested monochromator.

14.     On September 22, 2005, Innov-X's Dr. Hardman sent a detailed confidential email to XOS explaining that the application for which he was seeking a monochromator optical component was to excite catfine elements like Al and Si below the absorption edge of sulfur.

15.     Subsequent to the September 22, 2005 email from Dr. Hardman to XOS, XOS represented to Innov-X that XOS would build and supply the monochromator optical component that Innov-X specified.  XOS verbally told Innov-X that in the high volumes of orders expected for the application, the price of each monochromator optic would be much lower than it had originally estimated in the August 10, 2005 email.

16.     Innov-X relied on XOS's August and September 2005 communications to its detriment, and believed that XOS had in good faith agreed to provide the monochromator optical component that Innov-X had ordered, and did not inquire at that time about purchasing a monochromator from other alternative optical component manufacturers.

17.     In the few months following September 2005, on information and belief, XOS began building a monochromator optical component for Innov-X according to Innov-X's specifications.

18.     In contemporaneous communications between Innov-X's CEO Don Sackett and XOS's CEO David Gibson, Dr. Sackett told Mr. Gibson, on a confidential basis, that A.P. Moller-Maersk, the world's largest marine shipping company, was a potential customer for the Catfine EDXRF System.

19.     Dr. Sackett also told Mr. Gibson, on a confidential basis, that the market for which the Catfine EDXRF System was designed was a unique one that included measuring Al and Si catfines in petrochemical fuels with high sulfur content.

20.     In January 2006, XOS's Ning Gao visited Innov-X in Woburn, Massachusetts, and with Innov-X's Dr. Hardman, tested a monochromator optical component that XOS had built, and that was previously conceived by Innov-X's engineers, as per Dr. Hardman's September 2005 request.

21.     The January 2006 testing was generally successful, and after further testing and, system alignments, Innov-X concluded in or around May 2006 that the monochromator optical component XOS had built would be satisfactory for use in its conceived Catfine EDXRF System.

22.     In May 2006, however, XOS proposed to Innov-X that XOS instead supply Innov-X a very different product than what Innov-X had originally requested.  In particular, at least in a May 26, 2006 conference call, XOS proposed to build an entire XRF system for Innov-X that included two monochromators, instead of simply delivering the stand-alone monochromator optical component as Innov-X had originally requested, after it had been conceived by Innov-X scientists.

23.     On May 30, 2006, Dr. Bradley Hubbard-Nelson emailed David Gibson, XOS's CEO, and Ning Gao, an XOS engineer, rejecting XOS's proposal to provide a system that would use two monochromators.  Dr. Hubbard-Nelson in this email indicated that Innov-X was not interested in XOS's proposal to build the entire system along the design it proposed in the May 26, 2006 conference call, and that Innov-X wanted to go forward with the original design that it had conceived prior to August 2005, and had disclosed to XOS in the September 22, 2005 email from Dr. Hardman to XOS.

24.     At around this same time, in or around May 2006, Innov-X began seeking a formal supply agreement with XOS for XOS to deliver to Innov-X the monochromator optical component that it had originally promised to deliver to Innov-X for use in the Catfine EDXRF

System that Innov-X scientists had conceived prior to August 2005. XOS never responded in substance to this request for a formal supply agreement, and on information and belief, began stalling and purposefully delaying.

25.     Between late August 2006 and mid-September 2006, Innov-X's CEO, Don Sackett, and XOS's CEO, David Gibson, met in a series of in-person meetings where Mr. Gibson proposed that the two companies merge. At one of these meetings, Mr. Gibson stated to Dr. Sackett that he believed that XOS should be supplying the Catfine EDXRF System to potential customer Maersk, and not Innov-X.

26.     During this same period, Innov-X continued requesting a formal supply agreement between Innov-X and XOS, for XOS to supply a monochromator optical component for use in Innov-X's already conceived Catfine EDXRF System. XOS was non-responsive, and on information and belief, continued to purposefully delay.

27.     On information and belief, in the Fall of 2006, XOS approached another instrumentation company and suggested that the two companies together build a system for measuring catfines in petrochemical fuels and market it.

28.     In September 2006, XOS again indicated to Innov-X that it wanted to provide to Innov-X much more than the monochromator optical component that Innov-X had originally requested. XOS indicated that it also wanted to provide other components of the entire system, including the monochromator, the x-ray source, and detector.

29.     In an October 2, 2006 email from Innov-X's Bradley Hubbard-Nelson to XOS's David Gibson, Dr. Hubbard-Nelson rejected again XOS's proposal to manufacture essentially the entire EDXRF system that Innov-X had previously conceived, and again asked that a written supply agreement be made between XOS and Innov-X for supply of the monochromator optical

component that was originally requested.  Dr. Hubbard-Nelson indicated, in the October 2, 2006

email, that a supply agreement should have been in place since July 2006.  XOS was non-

responsive and continued to stall.

30.     In or around October 12, 2006, Innov-X's Dr. Sackett and XOS's Mr. Gibson had

a conversation in which Mr. Gibson indicated, to Innov-X's surprise, that XOS intended on

building and selling EDXRF systems that would compete directly with Innov-X.

31.     Up to that time, XOS was not marketing or selling an EDXRF system, and was

known chiefly as a supplier of optical components for XRF systems in general, and as a supplier

of wavelength dispersive XRF systems ("WDXRF") (capable of measuring only one element at a

time).

32.     In or around October and November 2006,  XOS began increasing its demands on

Innov-X.  In particular, in conversations between Innov-X's Dr. Sackett and XOS personnel,

including XOS's Vice President of Sales, Barry Beumer, XOS insisted that as a condition of

supplying Innov-X with the monochromator optical component, Innov-X agree that XOS would

have the right to pre-approve the markets and customers for Innov-X products that use the

monochromator optical component, and that Innov-X agree to a five year exclusive agreement

with XOS for supply of the monochromator optical component.

33.     XOS in particular wanted commitments from Innov-X about Innov-X's intended

customers for the Catfine EDXRF System, and a commitment from Innov-X to only sell such

systems and similar systems for applications that XOS would pre-approve.  At this time, XOS

again demanded that it supply to Innov-X almost the entire EDXRF system, rather than just build

and supply the monochromator optical component that was originally requested by Innov-X.

34.     In or around November 2006, after a year of purporting to work to supply Innov-

X with a monochromator optical component, XOS's Barry Beumer confirmed to Innov-X's Don Sackett in an in-person meeting that XOS would be competing with Innov-X and would be building and selling EDXRF systems in competition with Innov-X.

35.     In the same meeting, Mr. Beumer stated that XOS would no longer be selling the monochromator that it was building for Innov-X at the originally promised price, but rather would be selling it at an increased price that was multiples of the originally promised price.  Mr. Beumer also stated in this conversation that the price increase was to allow XOS to be competitive with Innov-X in the market for EDXRF systems.

36.     At around this time, after enduring multiple delays and stalling tactics from XOS, Innov-X began investigating the possibility of using another optical component vendor to supply the monochromator optical component for use in the Catfine EDXRF System.  Innov-X was forced to begin negotiations with a new optical component supplier, despite having spent nearly one year trying to get XOS to supply it with monochromators.

37.     In late 2006, Innov-X contacted the German company IFG to build a monochromator optical component that could be used with the Catfine EDXRF System.  IFG was a known supplier of optical components, and Innov-X had originally chosen XOS over IFG as its monochromator supplier, because XOS was located geographically closer to Innov-X's offices.

38.     In late 2006, Innov-X signed an exclusive supply agreement to provide the Catfine EDXRF System to Maersk Fluid Technologies ("Maersk"), a wholly-owned subsidiary of A.P. Moller-Maersk.  The agreement required Maersk to purchase Catfine EDXRF System units from Innov-X.  A critical Maersk performance requirement was that the units that Innov-X would provide Maersk must be able to measure Al and Si in fuel with relatively high sulfur

concentration.

39.     Innov-X also agreed to deliver the first batch of Catfine EDXRF System units to Maersk by a deadline of the first quarter of 2007.  Innov-X missed this delivery deadline because XOS had not delivered the monochromator optical components to Innov-X that Innov-X had requested over a year prior.

40.     In January 2007, IFG built a working monochromator for Innov-X for use in the Catfine EDXRF System.  After some testing and optimization for geometry, IFG was able to deliver to Innov-X a functional monochromator optical component in the first half of 2007.

41.     In late 2007, over two years after it first contacted XOS about the possibility of supplying it with a monochromator optical component, Innov-X first began selling the Catfine EDXRF System under the trademark "SEA-Mate."

42.     In or around December 2007, XOS began marketing a prototype EDXRF unit called "AliSiN."  In particular, in December 2007, XOS displayed the AliSiN product at an American Society for Testing and Materials (ASTM) meeting.  In or around the same time period, XOS also issued a press release on the AliSiN product.  AliSiN was specifically marketed to analyze Al and Si in petrochemical fuels with relatively high sulfur concentrations. This is the same market that Innov-X educated XOS about on a confidential basis.

43.     In or around December 2010, XOS introduced to the market a product called MAXINE.  On information and belief, MAXINE is designed to directly compete with Innov-X's products that are based on the Catfine EDXRF System technology that Innov-X conceived prior to August 2005, and later disclosed to XOS on a confidential basis, as outlined above.

44.     Based on at least the above facts, XOS committed common law fraud and as a result damaged Innov-X.

45.     In particular, XOS knowingly made false representations of material facts to Innov-X, including but not limited to representations that XOS was willing to supply the stand-alone monochromator optical component to Innov-X, that XOS was willing to work with Innov-X to meet the deadlines on the Catfine EDXRF System project, and that XOS was willing to supply the monochromator optical component at a promised price that Innov-X had already relied on, and that XOS was willing to supply the monochromator optical component without imposing any preconditions on Innov-X's customers or markets.

46.     On information and belief, XOS knew all of these statements and/or representations were false at the time it made them.

47.     XOS also intentionally made false statements to induce Innov-X to rely on these misrepresentations so that Innov-X would be delayed in bringing the Catfine EDXRF System to market, thereby allowing XOS sufficient time to develop and a launch a competing EDXRF system.

48.     For example, on information and belief, once XOS became aware of the market and potential customer for which the Catfine EDXRF System project was being executed, XOS purposefully began delaying its delivery of the monochromator optical components to Innov-X, and then increased the price of the monochromator by multiples of the price that the parties had originally discussed.

49.     XOS also began insisting on pre-conditions before it supplied the monochromator optical components, including insisting on a five year exclusivity supply agreement and an agreement that XOS must pre-approve Innov-X's customers and markets.

50.     On information and belief, these delaying tactics were intentional and purposeful so as to allow XOS in the meantime to develop competitor products to compete with Innov-X in

the same market.

51.    Innov-X justifiably relied on XOS's misrepresentations by continuing to spend valuable time negotiating and working with XOS, and because of XOS's delaying tactics, Innov-X missed the deadline for delivering the Catfine EDXRF System to Maersk, and was delayed for nearly a year in delivering the Catfine EDXRF System to market.

52.    Innov-X suffered damages due to XOS's false representations and purposeful delay, including damages relating to the number of products Innov-X would have sold to Maersk during the nearly one year of delay, and damages relating to Innov-X's failure to meet Maersk's delivery deadline.  As a result of the foregoing, Innov-X has been damaged in an amount to be determined at trial, and expected to be no less than $5,000,000, plus punitive damages, costs, fees, and pre- and post-judgment interest.

## **JURY TRIAL DEMAND**

Innov-X demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Innov-X prays for the following relief:

A.  Money damages in an amount to be determined at trial, for all losses suffered by Innov-X as the result of XOS's fraud;

B.  Money damages in the form of punitive damages for XOS's fraud;

C.  An award of multiple damages;

D.  An award of the costs of suit herein, including attorneys' fees;

E.  Pre- and post-judgment interest on the foregoing damages awards; and

F.  Such further and other relief as the Court deems just and proper.

Respectfully submitted,

INNOV-X SYSTEMS, INC.,

By its attorneys,

/s/ Robert D. Carroll
Robert D. Carroll (BRN 516813)
rcarroll@goodwinprocter.com
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts  02109
Tel.:  617.570.1000
Fax:  617.523.1231

Dated: April 8, 2011

## **CERTIFICATE OF SERVICE**

The undersigned counsel certifies that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 8, 2011.

<u>/s/ Robert D. Carroll</u>